UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ERIC EGGELSTON,

                Plaintiff,                        Case No. 16-cv-13368

v.                                               Honorable Thomas L. Ludington

NEXTEER AUTOMOTIVE CORP,

                Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On September 16, 2016, Plaintiff Eric Eggelston initiated the above-captioned action by filing his complaint against his former employer, Defendant Nexteer Automotive Corporation, and his former local union, United Automobile Aerospace and Agricultural Implement Workers of America, Local 699 ("Local 699" or "the Union").[1]  In his complaint Plaintiff alleges that Defendant Nexteer wrongfully terminated him from his A-bucket position in retaliation for his exercise of his rights under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq*, because of his race in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), the Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. 37.2202, and in retaliation for opposing a violation of ELCRA in violation of MCL 37.201(a). Defendant Nexteer (hereinafter "Defendant") moved for summary judgment on December 21, 2017. Plaintiff responded on January 11, 2018, and Defendant replied on January 25, 2018. ECF Nos. 32, 35, 36.

_____

[1] On November 3, 2016 Defendant Local 699 filed a motion to dismiss Plaintiff's claims against it pursuant to Federal Rule of Civil Procedure 12(b)(6).  The Court entered an order on January 20, 2017, granting the motion and dismissing Defendant Local 699.

**I.**

Plaintiff Eric Eggelston is a resident of Saginaw County, Michigan. On or about July 1, 2010, Plaintiff was hired as an assemblyman by Defendant Nexteer, a corporation domiciled in Delaware and operating a facility in Saginaw, Michigan. As a result of his employment with Nexteer, Plaintiff became a member of Local 699, a labor organization domiciled in the state of Michigan. Local 699 is a local chapter of the International United Automobile Aerospace and Agricultural Implement Workers of America ("UAW"). He was therefore party to a Collective Bargaining Agreement ("CBA") between Defendant Nexteer and Defendant Local 699.

Early into his employment, Plaintiff observed that Local 699 officials were not adequately representing African-American members in pursuing grievances. Eggleston Dep. at 21-22, ECF No. 35-3. Plaintiff therefore began assisting African-American employees in filing appeals. On one occasion spanning from late 2010 to early 2011, Plaintiff successfully assisted a man named Larease Williamson in appealing a wrongful discharge. *Id.* at 26–29. Prior to submitting the appeal, Plaintiff spoke with Site Industrial Relations Manager Dereon Pruitt[2] in their church's parking lot. *Id.* at 34. Prior to handing Mr. Pruitt the appeal letter, Plaintiff explained that they had an opportunity to right the wrong. *Id.* Plaintiff contends that Mr. Pruitt physically slapped the appeal out of Plaintiff's hands and stated that Plaintiff had no business in doing that and demanded that he mind his own business. *Id.* Plaintiff also contends that other people in the parking lot had to get in between Mr. Pruitt and Plaintiff and separate them. *Id.* Mr. Pruitt denies that this altercation took place. Pruitt Dep. at 7, ECF No. 32-3.

After word got out that Plaintiff successfully assisted Mr. Williamson, other employees asked Plaintiff to assist them with writing grievances and appeals. *Id.* at 30. On March 30, 2011 a union Committeeman, Joseph Laurin, came up behind Plaintiff and threatened him, stating,

---

[2] Mr. Pruitt was a friend of Plaintiff's who attended his church.

"Eric, either you stop this bullshit or I'm going to do something to you or about you." *Id.* at 33, 36; Resp. at 4. Plaintiff attempted to file a complaint about this incident in Defendant's labor relations office with representative Amy Schofield. *Id.* at 36. She told him she would not accept a complaint regarding the threat, and that Plaintiff would have to go the union. *Id.* at 37. Plaintiff pursued his complaint with the union, but they took no action. *Id.* Plaintiff then sought a personal protection order from a local court against Mr. Laurin. *Id.*

On January 6, 2012, Plaintiff filed a racial discrimination complaint with the International Union. *Id.* at 38–39. Less than two weeks later, Plaintiff's supervisor issued him a discipline, suspending him for the balance of his shift plus two weeks alleging that he stopped the assembly line. *Id.* at 40. Plaintiff filed a successful grievance and received back pay. *Id.* at 41. After returning from the suspension, Plaintiff was informed that he was banned from Plant 3 and involuntarily transferred to Plant 4. *Id.* at 24–25. On April 2, 2012, Plaintiff's supervisor, Shannon Decker, issued Plaintiff a discipline for unnecessarily making scrap. 4/2/12 Discipline, ECF No. 35-8. Ms. Decker asked if this was the first time he had done this. Eggleston Dep. at 66–67. Plaintiff responded affirmatively and Ms. Decker stated that she would recommend a suspension of the balance of his shift plus one day. *Id.* About 20 minutes later, Ms. Decker called back and said she had to give Plaintiff a penalty of the balance of his shift plus 30 days. *Id.* at 67. Plaintiff subsequently learned that Ms. Decker had spoken with someone at Labor Relations, possibly Mr. Pruitt, who gave the directive concerning the penalty. *Id.* Plaintiff filed a grievance, and was ultimately returned to work a few days later with back pay, and the discipline was removed from his record. *Id.* at 72.

On May 23, 2012, Ms. Decker issued Plaintiff a discipline for unexcused absences from May 16 to May 18, 2012. 5/23/12 Discipline, ECF No. 35-10. Plaintiff contended that his

supervisor altered the request by changing May 18 to May 15, and writing "2-days" next to it. 5/25/12 Grievance, ECF No. 35-12; Resp. at 7. Plaintiff was subsequently promoted to a position in the "A Bucket." Eggleston Dep. at 75, 78. In 2014, Denny Getgood became the Human Resources Business Partner supervising Plaintiff's area. Plaintiff had previously encountered Getgood in the hallway. On one occasion Getgood asked Plaintiff if he was "still raising hell." *Id.* at 90.

On March 14, 2014, Plaintiff requested FMLA leave for sleep apnea. *Id.* at 83. On March 27, 2014, Plaintiff submitted FMLA forms, including his medical certification. *Id.* at 83–84; Cert. Form, ECF No. 35-14. Mr. Getgood provided Plaintiff with a Designation Notice which indicated that his leave request was denied on April 7, 2014. Designation Notice, ECF No. 35-21. Mr. Getgood did not provide a reason for the denial. Eggleston Dep. at 97, 100. Plaintiff went through his union to obtain information concerning the reason for the denial of FMLA leave. *Id.* Plaintiff testified that he was the only African American that was denied FMLA leave without a reason. *Id.* at 106. Plaintiff filed a complaint with the union. *Id.* at 108–109.

On September 4, 2015, Mr. Getgood informed Plaintiff that he was terminated for theft from the market.[3] *Id.* at 126. Mr. Getgood interviewed Plaintiff, asking him several questions about how he paid for food from the market, why he stole items from the market, and whether Plaintiff was aware of the market's policies and procedures. *Id.* at 127. Plaintiff explained that he typically paid with either a market card or a debit card. Plaintiff also explained that there were no policies for returns and exchanges, and that he previously filed five complaints relating to the process for exchanging a bad product. *Id.* at 129. Plaintiff explained that there were occasions

---

[3] Nexteer contracts with a vending service, Market Twenty 4 Seven, who stocks and maintains an onsite market. The market is not staffed. Employees are to pay for items at a self-checkout scanner. Market Twenty 4 Seven is a vending service offered by Continental Café, Inc. (continentalserves.com). During Mr. Getgood's deposition, he refers to the market as "Canteen Services." During Mr. Pruitt's deposition, he refers to the market as "Continental Canteen." They all refer to the same entity. Getgood Decl. at ¶ 3, ECF No. 32-4.

where he would replace spoiled products, such as sandwiches or salads. *Id.* at 130–31. Plaintiff testified that he spoke with someone at an 800 number who forwarded the information to an employee who stocks the market. *Id.* Plaintiff testified he spoke with that individual in person who told him what to do if he purchased a bad item. *Id.* He testified that he would go in, hold the product up to the camera and rotate it. *Id.* He would then place it on the counter at the checkout kiosk. *Id.*

He testified regarding one such instance where he had purchased a sandwich that had gone bad costing about $7.00. When he returned it he no longer wanted a sandwich so he would take a pop. *Id.* at 95, 131–32. He would record these transaction in a log he kept in his locker. Eggleston Dep. at 160.[4] On one occasion he spoke with a market representative who offered to refund his market card. *Id.* at 134. He wanted a refund on his debit card which they could not provide, and he was not willing to wait three hours to receive a refund in person. *Id.* at 134. The employee authorized him to return the bad item by holding it up to the camera and take a bag of combos as a replacement. *Id.* Plaintiff further explained that this was common practice, as there were frequently many items left on the counter indicating someone had returned them. *Id.* at 135. Notwithstanding Plaintiff's explanation, Mr. Getgood terminated Plaintiff. 9/4/15 Discipline, ECF No. 35-15.

Mr. Getgood testified that the alleged theft was brought to his attention by members from loss prevention at Canteen Services. Getgood Dep. at 10, ECF No. 32-5. He met with the Canteen Services employees as well as Mr. Pruitt. *Id.* at 11. The Canteen Services employees "believed they had pictures of the gentleman that was stealing from the Market." *Id.* at 10. They

---

[4] The log has not been produced. Plaintiff contends he does not have the log and that it is still in Nexteer's possession. Eggleston Dep. at 160. Mr. Getgood did not recall Plaintiff stating that he had property to recover in his locker after he was terminated, but the standard procedure would have been for a member of management, security, or the union to gather the terminated employee's belongings. Getgood Dep. at 33-34.

did not provide Mr. Getgood copies of those pictures at that time. *Id.* at 11. Mr. Getgood did not review the surveillance footage until after Plaintiff was terminated. *Id.* at 13. Rather, he made the termination decision based on what Plaintiff reported during the interview. *Id.* at 23. Plaintiff's committeeperson Robert Essenmacher was also at the interview as well as an undisclosed witness from Nexteer management. *Id.* at 14.

At the interview, Mr. Getgood asked if Plaintiff had taken anything from the market without paying. *Id.* at 15. Plaintiff indicated that he had. *Id.* "One of his answers was that if he had bought product, a salad that the lettuce was not good, or something that did not taste good he would return it. His statement is that he would return it and grab something either that day or a couple days later." *Id.* at 16. According to Mr. Getgood, Plaintiff told him that "he never talked to anybody from Canteen Services." *Id.* During the interview, Mr. Getgood took handwritten notes, which he typed up afterward and attached to his declaration. The notes contain the following discussion:

> Q11: Is there a time any time that you have taken product without paying?
> A11: If I go in and buy a sandwich, if it has bad meat, lettuce, chicken salad, I take the sandwich back in by the check out, then if I'm hungry right then I'll grab something of the same amount or close to it.
> Q12: What happens if your not hungry right then?
> A12: I'll come back the next day or a couple of days later and take something of similar value or different product if they have not restocked.
> Q13: *Have you ever talked to someone, a member of management*?
> A13: *Shawn when he was in S6*. (followed up with Shawn, never talked to Eric about this.)

Getgood Decl. Ex. 1, ECF No. 32-4 (emphasis added). Based on the context and the response, it is unclear if Getgood was referring to company management or Canteen Services management, nor is it clear who Plaintiff was referring to in his response when he identified "Shawn."

Mr. Getgood further testified that Plaintiff was aware of the market's return policy, and that Plaintiff in fact told Mr. Getgood what it was: "The policy is there is a white envelope . . . you fill out your name, what you had purchased, the dollar value, and you turn that in. And then within three or four days, that actually is returned to you through the Union Rep. Mr. Eggleston actually told me that." *Id.* at 17. Mr. Getgood testified that Plaintiff informed him he never utilized the market's return policy, as "it was unreasonable for him to leave any kind of note." *Id.* at 17, 19. Mr. Getgood's testimony does not conform to his contemporaneous notes:

Q15: How often did you do this?
A15: Salads . . .often
Q16: How many times?
A16: Can't say, greater than 5.
*Q17: You know that there is a resolution process for the satellite area?*
*A17: Yea, fill out the form 3 or 4 days the Union calls you down.*
*Q18: The things you have left, did you leave a note, any communication?*
*A18: I have looked no way to do so. (he reiterated several times he has looked for ways to communicate).*
. . .
Q21: You return a product. No note. No communication. Returned immediately or several days taking something of similar value?
A21: No one has ever said anything to me, leaving a note is unreasonable.
. . .
Q22: Have you asked the union for help? You ran as a committeeman, you know the grievance process correct?
A22: Never asked the Union directly
. . .
Q25: Eric, do you have anything to add?
A25: I have never stolen anything from Nexteer or any of its vendors, period. *I'm not aware of any return policy*. I have looked.

Getgood Decl. Ex. 1, ECF No. 32-4 (emphasis added). Based on this discussion it is unclear if the "resolution process for the satellite area" refers to the Union grievance process or to the market's return policy, or if they are the same thing. Thus, it is unclear if Plaintiff was only aware of a union grievance policy, or of the market's return policy, or both. Plaintiff specifically stated he was not aware of a return policy. Exhibit 2-4 of the Getgood Declaration includes

Continental Canteen's refund request form, comment forms, and a comment box. ECF No. 32-4. Plaintiff specifically testified, however, that "there is no policies for returns or exchanges. There's no written policy, there's nothing posted in the store. And I have filed five complaints as it relates to how do we in our plant return an item or exchange an item that is bad." Eggleston Dep. at 131. Based on what Plaintiff said in the interview, Mr. Getgood terminated him for violation of shop rule two: "theft or misappropriation of property of employees or of the Company." *Id.* at 21; Shop Rules, ECF No. 35-17.

Greg Ledger, a Caucasian male employee, was terminated for stealing a pop. Pruitt Dep. at 19. Dave Smith, also a Caucasian male employee, was terminated for stealing plates for a party. *Id.* Mr. Ledger and Mr. Smith were both later reinstated under a "Last Chance Agreement" which was negotiated with the union. *Id.* at 20-21. Mr. Pruitt was "involved" in Mr. Ledger and Mr. Smith receiving last chance agreements.[5] *Id.* at 21-22. Mr. Pruitt met with the union chairperson, Bob Glaser, in response to Plaintiff's grievance, and Mr. Glaser asked for a Last Chance Agreement for Plaintiff as well. *Id.* at 21. Mr. Pruitt did not agree to give Plaintiff a Last Chance Agreement, because he didn't believe that the case warranted it. *Id.*

When asked why Mr. Ledger and Mr. Smith were treated differently than Plaintiff, Mr. Pruitt responded, "well at the end of my investigation looking into those cases, they didn't actually steal." *Id.* at 22. Mr. Pruitt was asked "Do you know how it came to be that they were, I guess, incorrectly accused of engaging in theft?" *Id.* at 31. Mr. Pruitt responded that Mr. Smith had taken plates from the cafeteria in response to a request from his supervisor to "bring them up for some kind of celebration." *Id.* at 31. With respect to Mr. Ledger, Mr. Pruitt responded that "Ledger was in there getting some fountain – he discovered he gets fountain pop whenever he's

---

[5] It is unclear who was responsible for their termination. Mr. Getgood, the Human Resource Business Partner who terminated Plaintiff, was not involved in the termination of Mr. Ledger or Mr. Smith nor was he involved in the grievance process related to their terminations. Getgood Decl. at ¶ 12, ECF No. 32-4.

in there working, so that's why." *Id.* When asked "who said that he gets fountain pop whenever he's in there working?" Mr. Pruitt "the cafeteria did." *Id.* When asked why they were given a Last Chance Agreement, and not just returned to work, Mr. Pruitt responded "that was the agreement I made with the union. Ledger had been fired before, and had Dave Smith been fired before." *Id.* at 22. Mr. Pruitt was unclear if the cafeteria was affiliated with Continental Canteen or "Sutherlands." *Id.*

When asked if there were any other allegations against Mr. Ledger or Mr. Smith, Mr. Pruitt responded "not that I can recall." *Id.* at 30. Plaintiff testified that he had the following conversation with Mr. Ledger following his termination: "I called him up. The -the Union president said, 'Eric, this is some bullshit and they know it. But they getting rid of you, so you wouldn't run for election.' He gave me Greg Ledger's phone number. So I called Greg up and I was like, 'Man, what's- what happened to you?' And he said, 'Hey, they fired me for theft like I heard they did you and then they brought me back on a last chance grievance.' I said. 'Greg, what was you doing?' He said 'I went to use my key, I go In the store and every day I would get me a Coca-Cola.'" Eggleston Dep. at 153-154.

Mr. Pruitt testified that upon reviewing the surveillance footage, he determined that Plaintiff did indeed steal. *Id.* at 22-23. Mr. Pruitt testified that the market had a process for returning spoiled food, involving filling out a card and waiting for a refund. *Id.* at 23. He testified that he knows that is the process because "it's in the market," and further testified that he has used the market. *Id.* Although he had never personally submitted a refund request, he knows that people have been refunded. *Id.* The meeting minutes from the Step 5 grievance meeting reflects the following summary:

Plant 4:

9353 – Eric Egleston – Union – Discharge SR. 2 stealing from the market. Other EEs were returned that had stolen from the market. Need the zip drive with the video. Mngt. Disp. = Dereon states the other two who were brought back for stealing were the last two to return for theft. This EE stole hundreds of dollars' worth of food.

ECF No. 19.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). "The party opposing summary judgment cannot rest on its pleading or allegations, to prevail, they must present material evidence in support of their allegations." *Leonard v. Robinson*, 477 F.3d 347 (6th Cir. 2007) (citing *Celotex Corp v. Catrett*, 477 U.S. 317 (1986)). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## III.

### A.

A plaintiff can establish a prima facie case of race discrimination by relying on direct or indirect evidence of discrimination. *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121 (1985); *Blalock v. Metals Trades, Inc.,* 775 F.2d 703, 707 (6th Cir.1985). Where a Plaintiff relies on indirect evidence, the *McDonnell Douglas* burden shifting framework applies, and a Plaintiff

must show 1) he was a member of a protected class, (2) he suffered an adverse employment action, (3) he was qualified for the position, and (4) that adverse employment action occurred under circumstances giving rise to an inference of discrimination. *In re Rodriguez*, 487 F.3d 1001, 1008 (6th Cir. 2007) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1972). The fourth element of the prima facie case can be established by showing that the plaintiff was replaced by a person outside his protected class, or was treated differently than a similarly situated person of a different class for the same or similar conduct. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir. 1992).

If the plaintiff succeeds in establishing a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory rationale for the adverse employment action. *In re Rodriguez*, 487 F.3d at 1008. Once the employer does so, the burden shifts back to the plaintiff to demonstrate that the articulated reason is a mere pretext for discrimination. Claims of race discrimination brought under the ELCRA are analyzed under the same standards as claims of race discrimination brought under Title VII." *Phillips v. UAW Int'l*, 149 F. Supp. 3d 790, 806 (E.D. Mich. 2016) (quoting *Dotson v. Norfolk S. R.R. Co.*, 52 Fed. App'x 655, 657 (6th Cir. 2002)).

**B.**

**i.**

Because Plaintiff offers no direct evidence of racial discrimination, the burden shifting framework established in *McDonnell Douglas* applies. *In re Rodriguez*, 487 F.3d 1001, 1008 (6th Cir. 2007) (citing *McDonnell Douglas Corp.,* 411 U.S. at 802). The parties do not dispute, nor can it reasonably be disputed, that Plaintiff has met the first three elements of his prima facie case for racial discrimination: 1) he was a member of a protected class (African-American), (2)

he suffered an adverse employment action, and (3) he was qualified for the position. *In re Rodriguez*, 487 F.3d at 1008. The disagreement centers on whether he has met the fourth element, namely whether he was treated differently than similarly situated employees for the same or similar conduct.

Plaintiff's argument is straightforward: "Plaintiff submits that he was treated less preferentially than Mr. Ledger and Mr. Smith,[6] who were both accused of engaging in the same misconduct, violation of Shop Rule 2, but were returned to work on a last chance agreement by Mr. Pruitt." Resp. at 35. Defendant contends that "Eggleston's two alleged 'comparators' were not similarly situated because they dealt with a different decision-maker, worked in a different department, and did not engage in conduct of comparable seriousness to Eggleston." Mot. at 12, ECF No. 32. Defendant further argues that "it is undisputed that Nexteer treated them the same as Eggleston by terminating their employment when Nexteer believed they had engaged in theft." *Id.*

As Defendant correctly notes, "It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly-situated in all respects." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); *see also Town v. Mich. Bell Tel. Co.*, 568 N.W.2d 64, 70 (Mich. 1997). The plaintiff and the comparators "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583.

---

[6] Plaintiff testified that Mr. Ledger and Mr. Smith are both Caucasian men. Eggleston Dep. at 52, 150. Defendant did not dispute this testimony.

First, it is not dispositive that Plaintiff and his comparators worked in different departments and had different supervisors, as the Sixth Circuit has recognized:

> Indeed, we have held, relying on *Ercegovich,* that a plaintiff claiming racial discrimination was similarly situated to a non-protected employee even though the two individuals worked in different ... departments and *had different supervisors* .... The fact that the two individuals had different supervisors did not prevent them from being deemed similarly situated, we reasoned, because all of the people involved in the decision-making process, including Plaintiffs immediate supervisor and the department manager, were well-aware of the discipline meted out to past violators, including [the non-protected employee], who had violated the policy on at least two occasions.

*McMillan v. Castro,* 405 F.3d 405, 413–414 (6th Cir. 2005) (emphasis in original) (internal citations and quotations omitted). Importantly, the fact that Plaintiff and his comparators *had* different supervisors is not dispositive here. The relevant fact is that they *dealt with the same supervisor.* That is, Plaintiff dealt with the same decision maker as Mr. Ledger and Mr. Smith *with respect to the post termination grievance.* The facts giving rise to the claim of disparate treatment relate to the reinstatement of Mr. Ledger and Mr. Smith, and the refusal to reinstate Plaintiff. Mr. Pruitt was a key decision maker, if not the only decision maker, with respect to the decision to reinstate Mr. Ledger and Mr. Smith. Indeed, he testified that he was "involved" with the decision. Pruitt Dep. at 21. He further testified that "at the end of *my* investigation looking into those cases, they didn't actually steal." *Id.* at 22. Mr. Pruitt was also the key decision maker with respect to Plaintiff's request for reinstatement. Mr. Pruitt met with the union chairperson, Bob Glaser, in response to Plaintiff's grievance, and Mr. Glaser asked for a Last Chance Agreement for Plaintiff as well. *Id.* at 21. Mr. Pruitt did not agree to give Plaintiff a Last Chance Agreement because he concluded that Plaintiff stole. *Id.*[7]

---

[7] Defendant argues in its reply brief that the Court has "already dismissed Eggleston's claims *related to the grievance process.*" Reply. at 2, ECF No. 36 (emphasis). This is an overly broad statement. In fact, the Court only dismissed Plaintiff's claims against the union for failure to adequately represent him and for retaliation. ECF No. 18. Dismissal of these claims against the Union has no effect on Plaintiff's racial discrimination claim against Nexteer

Defendant also argues that "Eggleston's conduct was also vastly dissimilar to Smith's and Leger's. Leger took fountain pop from the Market Place while he was working there, and Smith took supplies for a company function . . . By Contrast, on nine separate occasions over a period of four days, Eggleston took eleven items from the Market Place without paying for them." Mot. at 13. Defendant further notes that "after Smith and Leger filed grievances contesting their terminations, Pruitt investigated further and concluded that neither Smith nor Leger had actually stolen any items. Nexteer therefore returned them to work." *Id*. Indeed, Defendant produced a flash drive containing video footage of Plaintiff taking items without paying for them. Eggleston Dep. Ex. 12.

With respect to Mr. Smith, Defendant's argument is well taken. Mr. Pruitt explained that he determined Mr. Smith was in fact not stealing the plates but was taking them for use at a company function, and did so at the direction of a supervisor. Pruitt Dep. at 31. On these facts, no reasonable jury could determine that Plaintiff was similarly situated to Mr. Smith.

However, there does not appear to be any material difference between Plaintiff's conduct and Mr. Ledger's conduct. The items Plaintiff took were generally limited to soda, snacks, and comparable items. This is not meaningfully different from Mr. Ledger taking a fountain pop each day he worked in the cafeteria. It is unclear from the record how long Mr. Ledger had been working the cafeteria and how long he had been engaging in his practice of taking a fountain pop each time he worked. Indeed, it is entirely possible based on the record that the value of fountain pop Mr. Ledger took exceeded the value of the items Plaintiff took.[8] In any event, Plaintiff need not prove that he engaged in identical conduct to establish that he was similarly situated to Mr.

---

for Pruitt's failure to grant him a last chance agreement during union negotiations. Defendant also asserts that Mr. Pruitt is not responsible for the union's decision to withdraw his grievance. This overlooks the importance of Mr. Pruitt's decision to reinstate Mr. Ledger and Mr. Smith, and his decision not to reinstate Plaintiff.

[8] More importantly, as will be discussed below, the value of the items taken was not considered by Mr. Pruitt in making his decision. Pruitt Dep. at 20.

Ledger. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) ("The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated'"); *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008) ("The district court's framing of the similarly-situated standard is too narrow and necessitates an exact correlation not required by the law of this circuit. The prima facie showing is not intended to be onerous."). It is sufficient that Plaintiff has produced evidence that he and Mr. Ledger were terminated for theft, filed a grievance, and that Mr. Pruitt gave Mr. Ledger a last change agreement but not Plaintiff.

### ii.

If the plaintiff succeeds in establishing a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory rationale for the adverse employment action. *In re Rodriguez*, 487 F.3d at 1008. Here, Defendant has articulated a legitimate, non-discriminatory reason for the decision not to reinstate Plaintiff. Mr. Pruitt testified that he did not agree to give Plaintiff a Last Chance Agreement because he determined that Plaintiff stole. Pruitt Dep. at 21. He made this determination by looking at the video evidence. *Id.* at 23. Indeed, the video evidence showed Plaintiff taking several items without paying over a period of several days. Furthermore, Mr. Pruitt had personal knowledge of the return policy based on his own use of the market. *Id.* He testified that the return policy involved filling out a card if a customer is dissatisfied with a product and waiting for a refund. *Id.* Thus, Mr. Pruitt articulated a legitimate, non-discriminatory reason for the adverse action.

### iii.

Once the employer does so, the burden shifts back to the plaintiff to demonstrate that the articulated reason is a mere pretext for discrimination. *In re Rodriguez*, 487 F.3d 1001 (6th Cir.

2007). Plaintiff can demonstrate pretext in three ways: 1) by showing that the proffered reasons had no basis in fact; 2) that the proffered reasons did not actually motivate the adverse decision, or 3) that the proffered reasons were insufficient to motivate the adverse decision. *Scuderi v. Monumental Life Ins. Co.*, 344 F. Supp. 2d 584, 595 (E.D. Mich. 2004); *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (overruling on other grounds recognized by *Geiger v. Tower Auto.*, 579 F.3d 614, 621 (6th Cir. 2009)).

**a.**

Plaintiff cannot show that the proffered reason had no basis in fact. Mr. Pruitt was asked about the investigation he conducted to determine whether Plaintiff actually stole, and he responded that he reviewed the video evidence. Pruitt Dep. at 22–23. The video evidence shows Plaintiff taking items without paying for them. Eggleston Dep. Ex. 12, ECF No. 32-2 (produced via flash drive). Mr. Pruitt testified that the market had a process where you can fill out a card and get money returned to you if you're not satisfied with the product. Pruitt Dep. at 23. He knew this was the process because "it's in the market." *Id.*

Plaintiff has an extensive explanation as to why this does not prove that he stole anything. Plaintiff contends he spoke with a market employee who informed him it was acceptable for him to return an expired item by holding it up to the camera, placing it on the counter, and taking a replacement item. Eggleston Dep. at 130-33. He explained that if he wasn't hungry at the time he returned the item he would return the next day or a couple days later and take something. Getgood Decl. Ex. 1, ECF No. 32-4. He allegedly would record these transaction in a log he kept in his locker to ensure that everything was accounted for. Eggleston Dep. at 160. He contends that this is why the video evidence shows him taking items without paying for them. 157–182.

He also contends that the video evidence does not fully capture all relevant events, as it omits instances of him returning items. *Id.*

Nevertheless, the relevance of Plaintiff's explanation is limited. The issue is not whether Plaintiff is guilty or innocent of stealing from the market. The issue is whether Defendant *reasonably believed* he was stealing from market. That is, an employer is entitled to "reasonably and honestly rel[y] on a particularized set of facts in making an employment decision" even if it is "later shown to be mistaken, foolish, trivial, or baseless." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009). Thus, the issue is not whether Plaintiff was stealing from the market, but whether Mr. Pruitt had sufficient justification to believe that Plaintiff was doing so. Plaintiff's justification for his conduct is only relevant to the extent it was explained to Mr. Pruitt and impacted the basis for his reasonable belief.

Plaintiff has not provided any evidence regarding what explanation, if any, was provided to Mr. Pruitt during the grievance process. Mr. Pruitt testified that he determined Plaintiff stole based on the video evidence of Plaintiff taking items without paying for them on numerous occasions. Pruitt Dep. at 21. Even if it were reasonable to assume that Mr. Pruitt became aware of Plaintiff's explanation at some point during the grievance process, this still does not establish the existence of a jury question on whether Mr. Pruitt's decision had a basis in fact. Mr. Pruitt testified that he had personal knowledge of the existence of a return/refund process that other employees had successfully used. *Id.* at 23. That refund process did not involve employees taking it upon themselves to determine whether they were entitled to a refund for an item, nor did it involve employees taking replacement items at their discretion. Rather, the process involved the employee filling out a card indicating that they were dissatisfied with a product and waiting

for the market to issue a refund. *Id.* Plaintiff's conduct in the videos clearly does not comport with this refund process. Thus, Mr. Pruitt's decision had a basis in fact.

**b.**

Nevertheless, Plaintiff can establish pretext via the third method set forth in *Manzer*, namely that the proffered reasons were insufficient to motivate the adverse decision. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). This showing "ordinarily consists of evidence that other employees, particularly employees not in the protected class," were not subject to an adverse decision "even though they engaged in substantially identical conduct to that which the employer contends motivated" the adverse decision. *Manzer*, 29 F.3d at 1084.

It is worth noting at the outset that much of the following discussion involves arguments advanced by the parties in their discussion of Plaintiff's prima facie case. However, given the relatively light burden to establish his prima facie case, and the absence of a requirement that Plaintiff prove an exact correlation between himself and his comparators, much of the parties' discussion on this point is more appropriately directed at the pretext analysis. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) ("The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly-situated"); *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008) ("The district court's framing of the similarly-situated standard is too narrow and necessitates an exact correlation not required by the law of this circuit. The prima facie showing is not intended to be onerous.").

Notably, in *Hollins*, the plaintiff met her prima facie case by establishing that white women who engaged in the same conduct as the plaintiff, namely violation of the employer's

grooming policy, were not subject to the adverse decision. *Hollins v. Atl. Co.*, 188 F.3d 652, 660 (6th Cir. 1999). The employer then relied on that very grooming policy as its legitimate, non-discriminatory reason for the adverse decision. *Id.* The plaintiff then argued that the proffered reason was pretextual in that it was insufficient to motivate the discharge. *Id.* The plaintiff relied on the same evidence of disparate treatment, arguing that she was singled out for violating the grooming policy, whereas her white counterparts were not. The court found that the plaintiff had "raised a question of fact regarding whether [the employer's] grooming policy – which [plaintiff] claims was not applied to the white women - was a pretext for the employer's treatment of Hollins." *Id.*

Similarly, Eggleston identified disparate treatment as evidence establishing his prima facie case of race discrimination. Specifically, he asserted that his white counterparts had also engaged in theft, but that they were later reinstated with a last chance agreement. Defendant identified that same theft as its legitimate, non-discriminatory reason for the decision. At the pretext stage, Plaintiff asserted that he was treated less preferentially than Mr. Ledger for engaging in theft.

Defendant attempts to explain the reason for the disparate treatment. Defendant argues that Eggleston's conduct was "vastly dissimilar to Smith's and Leger's. Leger took fountain pop from the Market Place while he was working there, and Smith took supplies for a company function . . . By Contrast, on nine separate occasions over a period of four days, Eggleston took eleven items from the Market Place without paying for them." Mot. at 13. Defendant further notes that "after Smith and Leger filed grievances contesting their terminations, Pruitt investigated further and concluded that neither Smith nor Leger had actually stolen any items. Nexteer therefore returned them to work." *Id*. Indeed, Defendant produced a flash drive

containing video footage of Plaintiff taking items without paying for them. Eggleston Dep. Ex. 12.

As discussed above, there does not appear to be any material difference between the value of the items stolen by Plaintiff and Mr. Ledger.[9] At best there is an unresolved question regarding how many fountain pops Mr. Ledger stole. Indeed, it is entirely possible that the value of the items he took exceeded the value of the items Plaintiff took. More importantly, the value of the items stolen was not a basis for Mr. Pruitt's decision not to reinstate Plaintiff. Indeed, when asked "do you have any understanding or knowledge of the value of the food Mr. Eggleston's alleged to have stolen?" Mr. Pruitt responded "no." Pruitt Dep. at 20. An employer cannot make post-hoc rationalizations for an adverse employment decisions by identifying factors that were never considered by the decision maker in the first instance. *See Cutcher v. Kmart Corp.*, 364 F. App'x 183, 189 (6th Cir. 2010); *Weeks v. Michigan, Dep't of Cmty. Health*, 587 F. App'x 850, 857 (6th Cir. 2014). Thus, Defendant cannot rely on the "seriousness" of the alleged offenses to explain the disparate treatment when Mr. Pruitt never considered that factor.

In fact, Mr. Pruitt was very clear that the reason for treating the gentleman differently had nothing to do with the seriousness of the alleged offenses. Rather, the difference in treatment was a result of his determination as to whether an offense occurred at all. He testified that he determined Plaintiff "stole" and Mr. Ledger "didn't actually steal." Pruitt Dep. at 21–22. Mr. Pruitt was questioned about how he made this determination. His responses yield virtually no helpful information, and certainly would not preclude a jury from finding that his proffered reason was pretextual:

---

[9] Additionally, Mr. Pruitt testified that Mr. Ledger had also been fired on another occasion, though the circumstances of that were unclear. Pruitt Dep. at 22. Mr. Ledger was apparently reinstated on that occasion as well. The fact that he had previously been fired further calls into question why he was given more preferential treatment than Plaintiff.

*Q: How did you discover that they didn't actually engage in theft?*

*A: Based on my conversations with the Union, with the actual cafeteria service, whatnot.*

Q: Did you –

A: I think one was a supervisor of Dave Smith, also.

*Q: Do you know how it came to be that they were, I guess, incorrectly accused of engaging in theft?*

A: Yeah, they were in there working, in the cafeteria, and they was doing some work in there, I don't know what the work exactly was, and so the supervisor for Dave Smith asked him to bring some plates up for some kind of celebration. I don't know what it was; I don't know if it was a holiday or whatever. And so he took the plates out of there based on the request that he got from his boss. *Ledger was in there getting some fountain – he discovered he gets fountain pop whenever he's in there working, so that's why.*

*Q: Who said that he gets fountain pop whenever he's in there working?*

*A: The cafeteria did.*

Pruitt Dep. at 30–31. It is unclear what Mr. Pruitt meant when he said it was discovered that Mr. Ledger "gets fountain pop whenever he's in there working, so that's why." *Id.* Perhaps Mr. Pruitt meant he discovered that Mr. Ledger is in fact entitled to a complimentary pop whenever he works the cafeteria, and therefore no theft had taken place. This discovery could have been made during Mr. Pruitt's conversations with "the cafeteria service" and "whatnot." *Id.* On the other hand Mr. Pruitt might have meant something else. Perhaps Mr. Pruitt meant that upon discovering Mr. Ledger was only stealing fountain pop, Mr. Pruitt determined that Mr. Ledger's theft was too insignificant to warrant termination. It is unclear which interpretation is correct. Furthermore, if the former is the correct interpretation, it would be reasonable for Mr. Ledger to

have been cleared of all wrongdoing and immediately reinstated. However, his return had to be negotiated with the union pursuant to a "Last Chance Agreement." Mr. Pruitt was questioned about this, and he was less than informative:

> A: Well, at the end of my investigation looking into those cases, they didn't actually steal.
>
> Q: Okay. So why were they given a Last Chance Agreement, why weren't they just returned to work?
>
> A: That was the agreement I made with the Union. Ledger had been fired before, and Dave Smith had been fired before.
> . . .
> Q: Do you know if the Last Chance Agreements for Mr. Ledger and Mr. Smith specifically state that they did not steal?
>
> A: I don't recall exactly what the wording is on that document.
>
> Q: Okay. And I believe I asked you earlier, you know, if they had not actually committed theft, why they were given discipline, and I believe you said that was what you negotiated with the union, or words to that effect. I don't know if I have the exact quote.
>
>> MR. BARDELLI: I'd just object; it was asked and answered. You could refer back to his answer, prior answer.
>>
>> (BY MR. KELLY): What I wanted to clarify is why did you negotiate with the Union for a Last Chance Agreement if the two individuals didn't engage in theft?
>>
>> MR. BARDELLI: Object to the form of the question. I think – we'll have to go back and look at his testimony, whether or not it mischaracterizes it. So I'll object to the foundation too, but go ahead and answer if you can.[10]
>
> THE WITNESS: That's the settlement we came up with.
> . . .

---

[10] The objection is without merit. The question was proper as rephrased by Mr. Kelly at page 29:7-9. Mr. Kelly did not mischaracterize the previous testimony. The question was not asked and answered. The previous question was (after deponent indicated Mr. Ledger and Mr. Smith did not steal) "Okay then why were they given a Last Chance Agreement, why weren't they just returned to work?" *Id.* at 22. The deponent's response was "that was the agreement I made with the union." The new question at 29:7-9 was "why did you negotiate with the union for a last chance agreement if the two individuals didn't engage in theft?."

Q: So did you offer, or did you demand that they sign a Last Chance Agreement in exchange for them getting returned to work?

A: That was the agreement that was made, that they sign Last Chance Agreements.

Q: Okay. What brought that up?

A: That's what we negotiated. That's the agreement we came to.

Q: Okay. I want to know the process that led up to that?

A: I don't know whose idea, or who said Last Chance First, if that's what you're getting at. I can just tell you, that's what we agreed to.

*Id.* at 22, 29–30. Mr. Pruitt's testimony does not explain why an agreement for Mr. Ledger's reinstatement had to be negotiated if he was in fact innocent of all wrongdoing. The specific provisions of the "Last Chance Agreement" are not known by the Court, as the agreement has not been produced. The general nature of the agreement, however, seems self-explanatory. It implies that misconduct has occurred, and that no further misconduct will be tolerated by the employer. In other words, this is Mr. Ledger's "last chance." This is inconsistent with Mr. Pruitt's testimony that his investigation revealed no theft by Mr. Ledger. Furthermore, Mr. Pruitt offered no clear explanation for the specific conduct that Mr. Ledger engaged in, namely taking fountain pop, and how that did not constitute theft.[11] A question of fact therefore remains as to whether Mr. Ledger engaged in substantially identical conduct to Plaintiff but was nonetheless treated more preferentially. *See Manzer*, 29 F.3d at 1084. Thus, a reasonable jury could find that Mr. Pruitt's proffered reason for denying Plaintiff reinstatement was pretextual. Accordingly, Defendant's motion for summary judgment will be denied.

---

[11] In contrast, as explained above, he provided an explanation for Mr. Smith's conduct. With respect to Mr. Smith, he explained that he was not stealing the plates but was taking them for use at a company function, and did so at the direction of a supervisor. Pruitt Dep. at 31.

## IV.

### A.

The Michigan Elliott-Larsen Civil Rights Act prohibits retaliation or discrimination against an individual because that person has opposed a violation of the act. MCL § 37.2701(a). To establish a prima facie case of ELCRA retaliation, a plaintiff must show that: (1) he engaged in protected activity; (2) the protected activity was known to the defendant; 3) the defendant took adverse employment action against the plaintiff; and 4) that there was a causal connection between the protected activity and the adverse employment action. *Barrett v. Kirtland Cmty. Coll.*, 245 Mich. App. 306, 315 (2001); *Garg v. Macomb Cty. Cmty. Mental Health Servs.*, 696 N.W.2d 646, 653 (Mich. 2005). "To establish causation, the plaintiff must show that his participation in activity protected by the CRA was a 'significant factor' in the employer's adverse employment action, not just that there was a causal link between the two. *Barrett*, 245 Mich. App. at 315 (2001) (quoting *Jacklyn v. Schering–Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 929 (C.A.6, 1999).

### B.

Plaintiff has never been clear on what "violation of the act" he contends he opposed. Paragraph 111 of his complaint simply states that "Plaintiff engaged in activity protected by the Act by opposing a violation of the Act." ECF No. 1. In his deposition, Plaintiff stated that he is referring to "helping employees with either their grievances and/or appeals." ECF No. 191. Defendant argues that Plaintiff has not explained how helping employees file grievances involved opposing a violation of the act. Mot. at 7. Indeed, Plaintiff provides limited information regarding these grievances. He stated that he began helping African-American employees file grievances because he noticed a pattern that the Union was not giving them sufficient

representation. Eggleston Dep. at 21-22. This speaks only to Plaintiff's motivation for helping employees file grievances, as well as the Union's alleged conduct in failing to represent African-Americans. This provides no information regarding the underlying grievances themselves, and what alleged violation of the ELCRA Nexteer was engaged in that Plaintiff helped employees oppose.

The Williamson appeal is the only instance Plaintiff provides any specific information about. Plaintiff produced a copy of the Williamson appeal, which states "I am filing this appeal due to an unfair, unjust, excessive wrongful discharge by management." ECF No. 35-4. Plaintiff contends the appeal opposed racial discrimination, but does not support this assertion. Resp. at 17. Even assuming Plaintiff was engaged in protected activity by helping Williamson file this appeal, Plaintiff still does not establish a prima facie case. Mr. Pruitt did indeed testify that he knew about the Williamson appeal. Pruitt Dep. at 7. However, Plaintiff furnishes no evidence of causal connection between that appeal and the adverse decision. Temporal proximity does not establish that connection where the appeal was filed in November of 2010, and the adverse decision occurred approximately five years later. *Miller v. CVS Pharmacy, Inc.*, 779 F. Supp. 2d 683, 695 (E.D. Mich. 2011) ("the passage of eighteen months or more between her most recent complaints of mistreatment or discrimination and her discharge tends to undermine, rather than support, any notion that there was a causal connection between the two.").

In his response, Plaintiff explains: "Plaintiff engaged in protected activity over the course of several years. Plaintiff did oppose racial discrimination early in his career, including through assisting with Mr. Williamson's appeal. However, two more relevant activities exist for the summary judgment stage." Resp. at 17. Plaintiff breezes past his theory that helping others file grievances was the conduct giving rise to his ELCRA retaliation claim. He then directs the

Court's attention to two additional facts that he contends support his retaliation claim. "First, Plaintiff complained directly to Mr. Getgood that he was going to file a complaint of racial discrimination against him." ECF No. 18 (citing Eggleston Dep. at 105-06). Plaintiff offers no explanation for how informing someone of an intention to file a race discrimination complaint, as opposed to the filing of a complaint, constitutes protected activity. With absolutely no other information provided about this alleged statement he made to Mr. Getgood, it is simply not possible to ascertain what Plaintiff is even arguing, much less determine whether he has met a prima facie case of ELCRA retaliation.

Next, Plaintiff notes that on October 14, 2015, he filed a Charge of Discrimination with the Michigan Department of Civil Rights and Equal Employment Opportunity Commission. Resp. at 18. Plaintiff contends that "there is a gap of approximately three months between Plaintiff's filing of the Charge of Discrimination and the records documenting Mr. Pruitt's decision not to return Plaintiff back to work." *Id.* Plaintiff asserts that the evidence of close temporal proximity supports a finding of causation. He further asserts that disparate treatment of himself and Mr. Ledger and Mr. Smith (who did not file discrimination charges) supports a finding of causation. However, Plaintiff's argument skips from addressing the protected activity to addressing causation, and omits an important step. Mr. Pruitt must have been aware of the discrimination charges filed with the Michigan Department of Civil Rights and the EEOC when he made the adverse decision. Plaintiff does not even attempt to identify any evidence in the record that Mr. Pruitt had such knowledge at the time he made his decision. Nor does Plaintiff attempt to identify evidence in the record establishing when Mr. Pruitt's decision was made. It appears the decision was made some time close to the step 5 grievance meeting, if not at the meeting itself. This was the meeting attended by Mr. Getgood, Mr. Pruitt, various other

management officials, and the union Bargaining Chair, Bob Glaser. Eggleston Dep. at 140; Step

5 Grievance Meeting, ECF No. 35-19. The meeting minutes read as follows:

> 9353 – Eric Eggleston – Union Discharge SR. 2 stealing from the market. Other EEs    were returned that had stolen from the market. Need the zip drive with the video. Mngt.   Disp = Dereon states the other two who were brought back for stealing were the last two    to return for theft. This EE stole hundreds of dollars' worth of food.

The meeting took place on January 16, 2016, roughly three months after Plaintiff filed

discrimination charges with the Michigan Department of Civil Rights and the EEOC. Even

assuming the decision not to bring Plaintiff back was made at this meeting, Plaintiff has not

established that Mr. Pruitt knew of the discrimination charges at that time. Mr. Pruitt was asked

if he "reviewed any materials Nexteer submitted to the Michigan Department of Civil Rights."

And he responded "the only material that I may have submitted was something that was asked

directly to me." Pruitt Dep. at 28. He was also asked "do you have any responsibility in

providing answers back to the Michigan Department of Civil Rights as it relates to their

investigation of complaints Mr. Eggleston filed?" and he responded "the legal department

handles those." *Id.* at 26. He was asked "if Nexteeer provided an explanation to the Michigan

Department of Civil Rights as to why Mr. Ledger and Mr. Smith received Last Chance

Agreements was different or the same as your explanation today." He replied "I would have to

see the paperwork that you're referring to." *Id.* at 28. This testimony does not establish that Mr.

Pruitt knew about the discrimination charges when he made his decision not to give Plaintiff a

last chance agreement. Accordingly, Plaintiff has not met his prima facie case, and summary

judgment will be granted for Defendant on the ELCRA retaliation claim.

**V.**

**A.**

The Family and Medical Leave Act (FMLA) makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter," or to retaliate or discriminate against an employee for doing so. 29 U.S.C.A. § 2615(a)(1)-(2). "Absent direct evidence of unlawful conduct, FMLA-retaliation claims are evaluated according to the tripartite burden-shifting framework announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)." *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). This framework was set forth above at section III.A.

**B.**

Eggleston requested FMLA leave in March of 2014, over 18 months prior to his termination and the decision not to reinstate him. Eggleston Dep. at 83. Defendant correctly notes that "[T]he more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement his claim with other evidence of retaliatory conduct to establish causality." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010). Defendant also correctly notes that the Supreme Court has observed "[a]ction taken . . . 20 months later suggests, by itself, no causality at all." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001). In support of the FMLA claim, Plaintiff's response brief offers one page of legal standards and three sentences of perfunctory analysis. He reasserts the argument above that disparate treatment "is relevant to causation." Resp. at 20 (citing *Flones v. Beaumont Health Sys.*, 567 F. App'x 399, 408 (6th Cir. 2014)). First, *Flones* did not involve a claim for FMLA retaliation. Secondly, relevancy and sufficiency are not equivalent. Disparate treatment alone is not sufficient to establish his prima facie case, particularly when there is no

evidence that the disparate treatment at issue had anything to do with FMLA leave requests, as opposed to racial considerations and alleged theft. Second, Plaintiff argues that retaliation is a cognizable FMLA claim. The fact that retaliation is a cognizable claim does nothing to establish Plaintiff's prima facie case. Accordingly, summary judgment will be granted for Defendant on the FMLA retaliation claim.

## VI.

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment, ECF No. 32, is **GRANTED** in part, and **DENIED** in part, as follows:

- **DENIED** as to Counts I and III of Plaintiff's complaint (ECF No. 1)

- **GRANTED** as to Counts II and IV of Plaintiff's complaint (ECF No. 1).


s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: April 4, 2018

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 4, 2018.

s/Kelly Winslow
KELLY WINSLOW, Case Manager